**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**


BILLY GENE MARSHALL,        )
                         )
          Petitioner,        )
                         )
v.                         )     Case No. 10-CV-436-GKF-TLW
                         )
JAMES RUDEK, Warden,     )
                         )
          Respondent.      )


## OPINION AND ORDER

Before the court is the 28 U.S.C. § 2254 habeas corpus petition [Dkt. #1] filed by

Petitioner Billy Gene Marshall ("Marshall"), a state prisoner appearing *pro se*.  The Attorney

General of the State of Oklahoma filed a response to the petition on behalf of Respondent, James

Rudek, Warden of the Oklahoma State Reformatory (the "State"), and provided the state court

record necessary for resolution of Marshall's claims.  [Dkt. ##13, 15].  Marshall filed a reply.

[Dkt. #16].

### I. Background

Pursuant to 28 U.S.C. § 2254(3)(1), the historical facts as found by the state court are

presumed correct.  Following a review of the record, including relevant transcripts and exhibits,[1]

this court finds that the factual summary provided by the Oklahoma Court of Criminal Appeals

---

[1] In resolving the claims raised by Marshall in his petition, the court reviewed the following transcripts: Prelim. Hr'g TR. dated November 13, 16, 21, 2006 [Dkt. ##15, 15-1];  Trans. of Allen Hr'g dated January 16, 2007 [Dkt. #15-3]; TR. of Motions Hr'g dated February 28, 2007 [Dkt. #15-4]; TR. of Burks Motion Hr'g dated May 5, 2008 [Dkt. #15-5]; TR. of Motions Hr'g dated October 29-30, 2008 [Dkt. #15-6]; TR. of Jury Trial Vols. I-VII [Dkt. ##15-7 – 15-13]; TR. of Sentencing dated November 24, 2008 [Dkt. #15-14]; and State Court Pleadings [Dkt. ##15-15 – 15-20].

("OCCA") in its order resolving Marshall's direct appeal is adequate and accurate.  The OCCA

summarized the facts as follows:

> Appellant was convicted of the brutal murder and robbery of seventy-one year old Alonzo Tibbs, Jr.  Mr. Tibbs, also referred to as the decedent, was a retired employee of American Airlines and worked part time as a salesman for Prepaid Legal.  He lived with his girlfriend of eleven years, Jennifer Jones Garrett, on North Hartford Avenue in Tulsa, Oklahoma.  To those he knew, the decedent was more than willing to loan money in times of need.
>
> On June 14, 2006, Ms. Garrett left for work at approximately 7:20 a.m.  Mr. Tibbs was up and planned to wash and wax his Cadillac that morning.  He was to meet Ms. Garrett later that day at her place of work and exchange vehicles.  When he had not shown up by one o'clock, Ms. Garrett began phoning Mr. Tibbs.  She called him several times on his cell phone and on the house phone.  She never received an answer.  Ms. Garrett left work after 5:00 p.m., and attempted to locate Mr. Tibbs by calling his cell phone and his friends.   She arrived home at approximately 6:00 p.m., to find the front door of her home ajar.  She thought it unusual as the front door was usually either wide open or completely shut.  Upon entering the house, she called out for Mr. Tibbs.  Receiving no response, she walked toward the bedroom.  She saw the decedent's legs on the bedroom floor and called out his name.  Again receiving no response, she called the police.
>
> The police arrived to find Mr. Tibbs had been beaten to death.  There was a large amount of blood in the bedroom with blood spatter and blood transfer all over the bedroom.  The screen to the bedroom window had been pushed out and was lying on the grass outside of the house.  The window itself was open.
>
> Mr. Tibbs suffered injuries from twelve blows to the head from a blunt instrument.  His face had been beaten to a bloody pulp.  The right side of his forehead was caved in due to extensive skull fractures caused by the blows.  The state medical examiner determined the cause of death was blunt head trauma and that his injuries were consistent with being attacked with a hammer.  Mr. Tibbs also suffered small scrapes, tears or lacerations on his fingers, suggesting the possibility of defensive injuries.  Mr. Tibbs' wallet, which he always kept in his pants pocket, was missing.
>
> Mr. Tibbs was last seen alive on June 14 at approximately 11:30 a.m. when his neighbor Glen Humphrey saw him washing his Cadillac.  The two men spoke briefly and Mr. Tibbs said he was not feeling well.  Mr. Humphrey thought it was probably due to the heat and suggested Mr. Tibbs go inside and lay down.  The men concluded their conversation and Mr. Humphrey left with Mr. Tibbs still outside.
>
> Between 11:30 a.m. and noon that day, Nathaniel Jacobs, Sr., a next door neighbor to Mr. Tibbs, noticed the trunk to Mr. Tibbs' Cadillac was open but Mr. Tibbs was not around the car.  Mr. Jacobs had never seen that happen before.  He thought that something was wrong somewhere as his dog had been barking in the direction of Tibbs' house around noon that day.  At approximately 3:30 p.m., Mr. Jacobs returned from an errand to find the car trunk was still open.  Mr. Jacobs

knocked on the front door of Tibbs' home but received no answer.  Looking inside the large picture window, he saw flies inside the house.  Finding all of this unusual, Mr. Jacobs told his wife, who called Mr. Tibbs' home phone.  She received only a voice recording.  Mr. Jacobs left for another errand but soon returned unable to get the vision of the flies out of his mind.  When he returned to Mr. Tibbs' house and looked in the window a second time, the flies had increased.  Again, no one came to the door when Mr. Jacobs knocked.  He closed the trunk to Mr. Tibbs' car as he left.

On June 14, 2006, an arrest warrant was issued for Appellant for the May 30 robbery of the J & J Bargain Depot in Tulsa.  The store clerk, Ms. Washington, had been attacked by a black man armed with two hammers.  Detectives received an anonymous tip that Appellant was involved in the robbery.  As a result, a photographic lineup was prepared and Ms. Washington identified Appellant as the man who attacked her and robbed the store.

Based upon the similarities between the J & J robbery and the robbery/murder of Mr. Tibbs, Appellant was arrested for Mr. Tibbs' murder on June 15.  He was with his girlfriend She[li]a Jones.  Ms. Jones later told police that she and Appellant had lived across the street from Mr. Tibbs from September 2005 until January 2006.  She said Appellant and Mr. Tibbs were acquaintances and that Appellant had borrowed money from Mr. Tibbs.  Ms. Jones and Appellant moved twice before ending up at 4204 N. Frankfort, where they lived at the time of Mr. Tibbs' murder.  Ms. Jones was employed, but Appellant was not.  She gave Appellant money to repay the loan from Mr. Tibbs but she did not know if he ever actually paid Mr. Tibbs.  She also gave Appellant money to pay the rent but he never paid the landlord and she did not know what happened to the money.

On the day of the murder, Appellant, dressed in a white T-shirt and jeans, left about 9:00 a.m. saying he was going to make a hustle.  Ms. Jones understood this to mean Appellant was selling tires to make money.  Appellant returned to his house between 1:00 and 1:30 that afternoon to take Ms. Jones to work.  However, he had changed clothes and was wearing a striped shirt and shorts he said he got from his brother.

That night, Ms. Jones saw a story on the news about a body found at a house on 46th Street and North Hartford Avenue.  When she told Appellant, he identified the location as Mr. Tibbs home and said the last time he saw Tibbs, he was talking to a hooker.

The next day, June 15, Ms. Jones drove by Mr. Tibbs' home on her way to work.  She noticed a lot of cars at the house and wondered if they were having a family reunion or a funeral or something.  Appellant who was with her in the car, told her to go on, it was only the police and that was where they found the dead man.  Ms. Jones drove on to her sister's home nearby, and that was where Appellant was apprehended.

After police searched her house on North Frankfort, Ms. Jones conducted her own search.  She found the striped shirt, shorts, and shoes Appellant wore the afternoon of the murder.  Ms. Jones informed police, who returned with a search warrant and seized the items.  Ms. Jones also gave the police information about a house at 1524 East 51st Place North where she and Appellant had lived until mid-

May 2006, between the time they lived on Hartford Avenue and North Frankfurt. They had been evicted for failure to pay rent and the eviction notice on the door was in Appellant's name.  Ms. Jones had moved everything out of the house except for a twin bed, some clothing and trash.  When the police arrived at the house on June 15, they found a full trash can next to the refrigerator.  In the top of the trash can was some rotten food and several dirty baby diapers.  At the bottom of the trash can was a flannel sheet wrapped around several bloody items of clothing.  In a bedroom closet police found a tool kit containing a small hammer.

Ms. Jones later identified the cloth the items were wrapped in as her grandson's receiving blanket.  Inside the blanket were found bloody socks, which Ms. Jones identified as the type of tube sock worn by Appellant.  A lottery receipt and Prepaid Legal brochure with blood on them were also found inside the blanket.  Additionally, a black T-shirt and bloody pair of jeans containing a wallet in the front pocket were found.  The wallet contained Mr. Tibbs' identification but no money.  Ms. Jones identified the black T-shirt and jeans as items she had purchased for Appellant.

The socks and jeans subsequently tested positive for blood and DNA testing showed matches for Appellant and Mr. Tibbs.  Concerning the socks, a comparison with Mr. Tibbs' known DNA could not exclude him as a donor and the probability of selecting an African-American at random who could have contributed the DNA was 1 in 950 trillion.  Appellant could not be excluded as a DNA donor but a statistical value could not be reported.

Blood on Appellant's jeans was tested and DNA from both Mr. Tibbs and Appellant was found.  Mr. Tibbs could not be excluded as a major donor of the DNA, with the probability of selecting at random an African-American who could have contributed the information as 1 in 950 trillion.  Appellant could not be excluded as a minor contributor of the DNA in the sample, with the probability of selecting at random an African-American who could have contributed the sample as 1 in 14 million.

When interviewed by police, Appellant admitted going by the decedent's home the morning of the murder and seeing Mr. Tibbs washing his Cadillac.  Appellant claimed he spent the morning of the murder helping his half-brother, William Mayberry, cleaning gutters at a daycare on 51st Street.  Appellant said he saw three people in the area of Mr. Tibbs' home that morning.  He claimed they were known as Showboat, Moses, and a hooker.

The police were unable to locate any of the people named by Appellant.  William Mayberry testified that he saw Appellant some time prior to the time of the murder and they visited for about 20 minutes.  However, he could not remember if the day was June 14 or another day.  He did remember, though, that Appellant did not help him clean out gutters on June 14.  Appellant's niece, Sasha Mayberry, testified that she saw Appellant the day after the murder and that he was acting weird.  She asked him if he had anything to do with the murder the day before, and he walked away without responding to her question.

Appellant chose not to testify at trial.  Instead he presented a stipulation which read, Corporal Stout would testify that on June 16, 2006, he talked to

> Debra Mayberry, and she said Billy Marshall came to her house on Wednesday, June 14, 2006.

*Marshall v.* State, 232 P.3d 467, 471-473 (Okla. Crim. App. 2010).

On June 15, 2006, Marshall was arrested and charged in Tulsa County District Court, Case No. CF-2006-2922, in the murder and robbery of Tibbs.  The case was tried to a jury in November 2008.  Marshall was represented at trial by Assistant Public Defender Marny Hill.  At the conclusion of the trial, the jury found him guilty on Count I of First Degree Murder (21 Okla. Stat. § 701.7), and on Count II of First Degree Robbery (21 Okla. Stat. § 797), both After Former Conviction of Two or More Felonies.  The jury recommended life imprisonment without the possibility of parole for the murder conviction and life imprisonment for the robbery.  The trial court sentenced him accordingly, ordering the sentences to run consecutively.

Marshall, represented by Stuart W. Southerland, perfected a direct appeal in the Oklahoma Court of Criminal Appeals ("OCCA"), raising seven propositions of error:

1. The admission of the DNA evidence, without the testimony of Dr. Valerie Fuller, the person who conducted the analysis of the evidence, violated provisions of Oklahoma statutory law and the Confrontation Clause of the United States Constitution.

2. DNA evidence admitted without any statistical significance was irrelevant and prejudicial in violation of the Oklahoma Evidence Code.  The error contributed to the denial of Appellant's right to a fair trial under the Fourteenth Amendment to the United States Constitution.

3. The use of "other crimes" evidence in this case violated Oklahoma law and denied Appellant a fair trial under the Fourteenth Amendment to the United States Constitution.

4. The District Court's refusal to grant Appellant's request for a continuance of the trial herein constituted an abuse of discretion.

5. The search warrant affidavit in support of the search warrant for 1524 E. 51st Place North lacked probable cause.  The search was conducted in violation of the Fourth Amendment to the United States Constitution and Article II, § 30 of the Oklahoma Constitution.

6. The jury was improperly presented with evidence of former felony convictions prior to sentencing Appellant for First Degree Murder in Count One.

7. The combined error at Appellant's trial served to deny him the right to a fair trial.

[Dkt. #10, Ex. 2].  The record further reflects that by order filed September 23, 2009, in Case No.

F-2008-2270, the OCCA granted Marshall's motion to file a *pro se* supplemental brief.  [Dkt.

#11, Ex. 6].  The copy of the *pro se* supplemental brief provided by Marshall contains the

following six propositions of error:

1. Appellant was deprived of effective assistance of counsel and a fair trial because trial counsel failed to examine Detective Jeff Felton concerning whether statements he asserted within the search warrant affidavit were accurate and provided to him by Shelia Jones in violation of Appellant's rights as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution.

2. Trial counsel's failure to object to a discovery violation and the use of known false evidence represented by the prosecution deprived Appellant of the effective assistance of counsel and a fair trial in violation of the Sixth and Fourteenth Amendments of the United States Constitution.

3. Trial counsel's failure to move to suppress items seized from the residence located at 1524 East 51st Place North after an illegal warrantless entry by police without exigent circumstances deprived the Appellant of the effective assistance of counsel guaranteed by the Sixth Amendment of the United States Constitution.

4. The search warrant obtained after the unlawful entry to look for potential dangerous persons was not obtained in good faith belief that it was supported by probable cause; contained reckless falsehoods and a material omission; was facially deficient and no reasonable judge could have found the existence of probable cause.

5. Appellant was deprived of effective assistance of counsel because trial counsel failed to move to suppress all evidence obtained from the use of buccal swab evidence because Appellant was not advised of his Miranda rights in violation of the Sixth Amendment of the United States Constitution.

6. Appellant was deprived of effective assistance of counsel because trial counsel failed to move to suppress all evidence obtained from the use of buccal swab DNA evidence because <u>the search warrant affidavit contained falsehoods</u> that rendered it defective in violation of the Sixth Amendment of the United States Constitution. (emphasis in original)

[Dkt. #11, Ex. 7].

In a published opinion filed May 13, 2010, in Case No. F-2008-1170, the OCCA, citing *Melendez-Diaz v. Massachusetts,* 557 U.S. 305 (2009), held the trial court abused its discretion in allowing Jonathan Wilson to testify to the findings of Dr. Fuller contained in Dr. Fuller's DNA report. *Marshall*, 232 P.3d at 475-76. However, it concluded the admission of the testimony regarding the DNA evidence was harmless beyond a reasonable doubt in light of other evidence presented. *Id.* at 476. It rejected Marshall's remaining grounds for appeal. *Id.* at 476-82.

Marshall raises six grounds of error in his petition:

I.  The admission of the hearsay testimony and reports without the testimony of Dr. Valerie Fuller, the person who conducted the analysis of the DNA evidence, violated the Confrontation Clause of the United States Constitution.

II. The use of other crimes evidence deprived Marshall of a fair trial in violation of the United States Constitution.

III. Marshall was deprived of effective assistance of counsel because trial counsel failed to cross-examine detective Jeff Felton concerning whether statements he asserted in the search warrant affidavit were accurate and provided to him by She[li]a Jones.

IV. Trial counsel's failure to object to the use of known false evidence presented by the prosecution deprived Marshall of effective assistance of counsel.

V.  Trial counsel's failure to move to suppress items seized from the residence located at 1524 East 51st Place North after an illegal warrantless entry by the police without exigent circumstances deprived the Petitioner of the effective assistance of counsel in violation of the Sixth Amendment of the United States Constitution.

VI.   Marshall was deprived of effective assistance of counsel because trial counsel failed to move to suppress all evidence obtained from the use of buccal swab DNA evidence because the search warrant affidavit contained falsehoods that rendered it defective in violation of the Sixth Amendment of the United States Constitution.

[Dkt. #1].

The State moved to dismiss Grounds 3-6 [Dkt. #10], arguing Marshall had failed to exhaust state remedies for those grounds, and asserting Marshall had an available remedy for the unexhausted grounds in the form of an application for post-conviction relief.  The court denied the Motion to Dismiss, finding that Marshall had satisfied the exhaustion requirement for the claims raised in the petition.  [Dkt. #12 at 7].

## II. Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides the standard to be applied by federal courts reviewing constitutional claims brought by prisoners challenging state convictions.  Under the AEDPA, when a state court has adjudicated a claim, a petitioner may obtain federal habeas relief only if the state decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *See* 28 U.S.C. § 2254(d)(1)-(2); *Williams v. Taylor*, 529 U.S. 362, 402 (2000); *Neill v. Gibson*, 278 F.3d 1044, 1050-51 (10th Cir. 2001).  When a state court applies the correct federal law to deny relief, a federal habeas court may consider only whether the state court applied the federal law in an objectively reasonable manner.  *See Bell v. Cone*, 535 U.S. 685, 699 (2002); *Hooper v. Mullin*, 314 F.3d 1162, 1169 (10th Cir. 2002).  Under 28 U.S.C. § 2254(e)(1), a determination of a factual issue made by a state court shall be presumed to be correct, and the applicant has the burden of rebutting the

presumption of correctness by clear and convincing evidence.  "[The] AEDPA prevents

defendants—and federal courts—from using federal habeas corpus review as a vehicle to

second-guess the reasonable decisions of state courts."  *Renico v. Lett*, 559 U.S. 766, (2010).

All grounds were adjudicated by the OCCA.  Therefore, the claims will be reviewed

pursuant to § 2254(d).

### III. Analysis

### Ground I:  Admission of DNA Evidence/Sufficiency of Other Evidence

On direct appeal, Marshall argued that his Sixth Amendment right to confront witnesses

against him was violated when Jonathan Wilson, a Tulsa Police Department forensic DNA

examiner, testified in the place of Dr. Valerie Fuller, who was working in Iraq at the time of trial,

about DNA testing she conducted.  *Marshall*, 232 P.3d at 474.  The OCAA agreed with Marshall

that the testimony was a violation of the Confrontation Clause.  *Id.* at 475-476.  However, it

determined, in the context of the other evidence presented, that the error in admitting Wilson's

DNA testimony was harmless beyond a reasonable doubt.  *Id.* at 476.

In his habeas petition, Marshall argues the admission of Wilson's DNA testimony was

*not* harmless error, because the other evidence offered by the state was insufficient to support a

guilty verdict.

Confrontation Clause violations are subject to harmless error analysis. *U.S. v. Summers*,

414 F.3d 1287, 1303 (10th Cir. 2005).   In a habeas corpus case, an error is harmless when the

court finds that it did not have "substantial and injurious effect or influence in determining the

jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993) (internal citations omitted).

In a habeas proceeding, the court reviews the sufficiency of the evidence "in the light

most favorable to the prosecution" and asks whether "any rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Anderson-Bey v. Zavaras*, 641 F.3d 445, 448 (l0th Cir. 2011) (citing *Jackson*, 443 U.S. at 324). "A § 2254 applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* "This standard of review respects the jury's responsibility to weigh the evidence and to draw reasonable inferences from the testimony presented at trial." *Dockins v. Hines*, 374 F.3d 935, 939 (10th Cir. 2004) (citing *Jackson*, 443 U.S. at 319). In other words, the standard of review "impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Jackson*, 443 U.S. at 319.

In applying the *Jackson* standard, the court looks to Oklahoma law to determine the substantive elements of the relevant criminal offense. *Jackson*, 443 U.S. at 324 n. 16. Marshall was charged in Count I with Murder in the First Degree in violation of 21 Okla. Stat. § 701.7, and in Count II with Robbery in the First Degree, a felony in violation of 21 Okla. Stat. § 797. Section 701.7 provides, in pertinent part:

> A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.

21 Okla. Stat. § 701.7.

> Section 798 provides:

> Any person guilty of robbery in the first degree shall be guilty of a felony punishable by imprisonment in the State Penitentiary not less than ten (10) years.

21 Okla. Stat. § 798.

> Robbery is defined as follows:

Robbery is a wrongful taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.

21 Okla. Stat. § 791.

Robbery in the first degree is defined as follows:

Robbery in the first degree is when, in the course of committing the theft, the defendant:

1.  inflicts serious bodily injury upon the person;
2.  threatens a person with immediate serious bodily injury;
3.  intentionally puts a person in fear of immediate serious bodily injury; or
4.  commits or threatens to commit a felony upon the person.

When accomplished in any other manner, it is robbery in the second degree.

2l Okla. Stat. § 797.

The court agrees with the OCCA that admission of the DNA evidence through the testimony of Jonathan Wilson violated Marshall's right of confrontation. *See Melendez-Diaz, supra.* However, even excluding evidence and testimony by Wilson, the evidence against Marshall, when viewed in the light most favorable to the prosecution, was nonetheless sufficient for a rational fact-finder to have found beyond a reasonable doubt that Marshall was guilty of both Murder in the First Degree and Robbery in the First Degree a Felony. In addition to the summary of facts provided by the OCCA and quoted in the Background section above, a review of the record establishes the following:

Mr. Tibbs' live-in girlfriend of 11 years, Jennifer Jones Garrett, testified she left for work around 7:20 the morning of June 14, 2006. Mr. Tibbs was up and planning to wash and wax his Cadillac that morning. He was to meet Garrett later in the day at her place of work to exchange vehicles. [Dkt. #15-8, Tr. Trans. at 361-364]. Garrett attempted to call Mr. Tibbs several times, but got no answer. [*Id.* at 365, 369]. Garrett got off work sometime after 5 p.m. and proceeded

home, but continued to call the home phone, Tibbs' cell phone and a friend, without success. [*Id.* at 369].  She arrived home at about 6:10 or 6:15, noticed the front door was ajar and went into the house.  [*Id.* at 370].  She called for him because she could see his legs from where she stood, and when he did not respond, she left the house and called 911.  [*Id.* at 365-370].

Mr. Tibbs was found beaten to death on the floor of his bedroom, next to his bed.  [Dkt. #15-9, Tr. Trans. at 516-17; State's Exs. 12-15].  The medical examiner testified Mr. Tibbs had suffered 12 blows to the head; the right side of his forehead was caved in due to the extensive fracturing of his skull.  He determined the cause of death was blunt head trauma consistent with blows from a pipe, wrench or hammer.  [*Id.* at 592-95, State's Exs. 51-57].

Glenn Humphrey, one of Mr. Tibbs' neighbors, testified he saw Mr. Tibbs at 10 or 11 on the morning of June 14, 2006, washing his cars.  Mr Tibbs told him he was feeling kind of sickly, and Humphrey told him it was heat stroke and to go back in the house.  [*Id.* at 490-91]. Humphrey remembered Marshall as being a former resident who lived about two houses south of him, across the street from Mr. Tibbs; he did not know if he was living across the street from Mr. Tibbs at the time Mr. Tibbs was killed.  [*Id.* at 488-89].

Mr. Tibbs' next door neighbor, Nathaniel Jacobs, Sr., noticed the trunk to Mr. Tibbs' Cadillac was open around 11:30 a.m. to noon that day; it was still up when he went by the residence about 3:00 or 3:30 in the afternoon, so he stopped by the house and knocked on the door.  Nobody answered, so he looked in through the window and saw flies inside the window. He had his wife call Mr. Tibbs' home phone, and she got a recording.  He stopped by the house a second time, knocked, and no one came to the door.  He looked in and there were even more flies in the living room window.   He closed the trunk to Mr. Tibbs' Cadillac as he left.  [*Id.* at 397-401].  He also noticed a screen was off a window on the east side of Mr. Tibbs' house.  [*Id.* at

402].  Jacobs, who works the night shift and sleeps in the morning, also testified that around noon on the day of the murder, his dog woke him up barking in the direction of Mr. Tibbs' house. [*Id.* at 403-405].  He testified his house and Tibbs' house back up to a creek, and Tibbs' back fence is a chain-link fence about five feet high, with barbed wire on the top.  [*Id.* at 410-411].

Detective Bob Little testified that Tulsa Police detectives had investigated a robbery of the J & J Bargain Depot in Tulsa on May 30, 2006.  The store clerk, LaDonna Washington, was attacked by a black man armed with two hammers.  Detectives received an anonymous tip that Marshall was involved in the robbery.  As a result, they prepared a photographic line-up, and Washington identified Marshall as the man who attacked and robbed her.  An arrest warrant was obtained for Marshall for the J & J robbery on June 14, 2006. [Dkt. #15-10, Tr. Trans. at 691-700].  Washington testified that Marshall was the man who attacked her with two hammers, tied her up in the store bathroom and robbed her on May 30, 2006.  [Dkt. #15-12, Tr. Trans. at 1028, 1035-42].

Police noticed similarities between the Tibbs murder and the J & J robbery.  In both cases, the victims were bludgeoned.  In the J & J robbery, hammers had been used.  In the Tibbs murder, it appeared that hammers could have been used. [Dkt. #15-10, Tr. Trans. at 704].  Marshall was arrested in connection with the J & J robbery on the afternoon of June 16, 2006.  He was with his girlfriend Shelia Jones at the time.  [*Id.* at 705-706].

Jones consented to a search of the residence she shared with Marshall at 4204 North Frankfort, and also told police that she and Marshall had recently moved from a house at 1524 East 41st Place North.  [*Id.* at 706-709].

At trial, Jones testified she and Marshall lived together from approximately October 2005 until June 2006.  [Dkt. #15-11, Tr. Trans. at 978].  She lived in the 4600 block of North Hartford Avenue, across the street from Mr. Tibbs, from August 2005 until January 2006.  Marshall and Tibbs were acquaintances, and Marshall borrowed some money from Tibbs in December 2005. Jones and Marshall moved to 1524 East 51st Place North in January 2006, and lived there until the middle of May 2006.  They moved out because they got a notice to vacate or pay rent, and she could not afford to pay all the back pay rent.  She removed everything but a box spring to a twin-size bed and some clothing items and trash.  Marshall had the key to the house, although Jones did not know if he had it on June 14, 2006. [*Id.* at 972-978].

Jones testified that she earned the money in the household. She would give money to Marshall to pay the rent, but he did not pay it to the landlord.  Marshall did not have a job.  In order to get money, he would "make a hustle," which meant he would sell tires. The last time she was in the house at 1524 East 51st was two weeks before the end of May 2006.  [*Id.* 979-81].

On the day of the murder, Jones was living with Marshall at 4204 North Frankfort Avenue.  She got up between 7:30 and 8:00 that morning, right after Marshall got up.  She was going to work that evening.  Marshall was wearing a white T-shirt and blue jeans.  He did not have any work that day, but left the house around 9:00 or 9:30 a.m.  He told Jones he was going to make a hustle.  Marshall came back to the house around 1:00 or 1:30 when it was time for him to take her to work. He was wearing different clothing—a striped shirt with shorts.  She asked him about the shorts, because she had never seen him in any shorts before.  He told her he got the shorts from his brother.  [*Id.* at 989-92].

Jones heard on the news while at work that evening that a body had been found on 46th Street North.  When Marshall came to pick her up, she asked him if he had heard about the body

found on 46th Street and Marshall told her it was "his home," and that the last time Marshall saw him he was talking to a hooker.  [*Id.* at 993-97].[2]

The next day, June 15, 2006, on the way to work Jones drove by Mr. Tibbs' house with Marshall in the car.  Marshall told her she was being nosy. Jones testified she saw a bunch of cars and said, "Hmm, I wonder what they doing.  Having a family reunion or a funeral or something?"  Marshall responded, "Girl, that's just police.  That's where they found that man dead."  Jones testified she had never specifically told Marshall where the murder took place.  [*Id.* at 999-1001].

After police searched her house on North Frankfort, Jones and her son conducted a search of their own and discovered the striped shirt, shorts and shoes Marshall had worn the afternoon of the murder. She informed police, who came to her house with a search warrant and seized the items.  [*Id.* at 1004-06].

Police obtained a search warrant for the house at 1524 East 51st Place North, where Marshall had lived with Jones until mid-May 2006.  There was an eviction notice in the house in the name of Billy Marshall.   In the kitchen, a full kitchen trash can was next to the refrigerator. In the top of the trash can there was some rotten food and several dirty baby diapers.  At the bottom of the trash can, detectives removed a bundle of items that were wrapped in a flannel sheet.  The items were bloody.  [Dkt. #15-10, Tr. Trans. at 810-14].

Among the items found in the bundle were a lottery ticket and a Prepaid Legal brochure, a nightgown, a brown button-up shirt with a diamond pattern,  two socks and a pair of jeans—all with red stains on them. A wallet was found in the right front pocket of the jeans.  The wallet contained identification and miscellaneous cards in the name of Alonzo Tibbs.  The wallet did not contain any money.  [*Id.* at 815-17, State's Exhibit 102].  In the closet of a bedroom in the

---

[2] Jones testified that, at that point, she did not know Marshall was talking about Mr. Tibbs.  [*Id.* at 997:15-17].

house, police found an open tool kit with a hammer.  The head portion of the hammer had reddish staining on it.  [*Id.* at 818-19, State's Exhibits 99-100].

The items seized from 1524 East 51st Place North, along with the shoes, shirt and shorts taken from 4204 N. Frankfort, were submitted for DNA testing.  Byron Smith, a DNA analyst with the Tulsa Police Department Forensic Laboratory, testified that in July of 2006, he was an evidence prescreener for the biology section, working for Dr. Valerie Fuller.  In that capacity, he prescreened items of evidence to determine their suitability for DNA testing, by obtaining presumptive tests (chemical color tests) that indicate what a stain or substance might be.  Smith ran tests for blood on items of evidence collected in the Tibbs murder.  He testified that the Prepaid Legal brochure and lottery ticket, the nightgown, the brown shirt, the two socks and the jeans found in the trash can, as well as Marshall's left tennis shoe and shorts seized from 4204 North Frankfort, tested positive for the presence of blood.  [*Id.* at 840-51].[3]  The hammer tested negative for the presence of blood.  [*Id.* at 860-61].

When Marshall was interrogated by Tulsa police, he admitted going by the victim's house the morning of the murder and seeing Mr. Tibbs washing his car.  Marshall said he saw three individuals in the area of the victim's house the morning of the murder.  He claimed they were "Showboat, "Moses" and a hooker.  He claimed he spent the morning of the murder helping his brother clean gutters at a daycare on 51st Street.  Tulsa Police detective Vic Regalado testified that police canvassed the immediate area around the Tibbs home to find the three individuals identified by Marshall.  He said police never came across anyone who knew a person named Showboat or Moses.  He testified that police were able to find one person who said she was aware of some lady that did walk up and down that street.  Further investigation revealed the

---

[3] In closing arguments, the prosecutor theorized that because the house on 51st Street North lacked running water, Marshall had used the nightgown and brown shirt to wipe blood off of his body.  [Dkt. #15-13, Tr. Trans. at 1224-25].

person may have been named Lynn and that she may have engaged in prostitution.  However, they were never able to find the individual or anyone else who could verify that type of activity or that person.  Regalado interviewed defendant's brother, but was unable to corroborate defendant's statement that he had been with his brother the day of the murder. [Dkt. #15-12, Tr. Trans. at 1108-1119].

Defendant's brother testified that on June 14, 2006, Marshall came over to his house sometime between 10:30 a.m. and 12:30 p.m. for 20 or 25 minutes.  Marshall was wearing blue jean cutoffs.  He testified that Marshall seemed nervous during the visit. Marshall did not go with him to help him clean gutters at a daycare on 51st Street that day.  The brother testified he and Marshall had done work for the daycare three months before that day, but neither did any work for the daycare on June 14, 2006.  [*Id.* at 1075-88].

Marshall's niece, Sasha Mayberry, testified she saw Marshall at about 11 a.m. on June 15, 2006, at her mother's house in Vernon Manor Apartments, and "he was acting weird."   [*Id.* at 1164-65.]   She asked him what was wrong and he told her that he had done something. Then she asked him if he had anything to do with the death of the elderly black gentleman the night before.  He did not respond to her, and walked away from her. [*Id.* at 1172-73].

Marshall elected not to testify.  He called no witnesses, but presented a stipulation that, "Corporal Stout would testify that on June 16, 2006, he talked to Debra Mayberry, and she said Billy Marshall came to her house on Wednesday, June 14, 2006." [Dkt. #15-13, Tr. Trans. at 1196-99].

Despite the strength of the evidence, Marshall attacks, at length, the reliability of the remaining evidence.[4]  The alleged defects can be categorized as follows:

---

[4] In his habeas petition, Marshall lists 83 alleged defects in the evidence presented at trial.

- The warrant for his arrest in the robbery of the J & J Depot Store two weeks earlier was improperly issued; the evidence showed Marshall did not commit the J & J robbery because he did not fit the description of the robber given by the store clerk, LaDonna Washington.[5] Washington's identification of him as the J & J robber was unreliable. [Dkt. #1 at 7-12, Items 1-22].[6]

- Other than "Item No. 31"—a pair of long blue jeans alleged to have previously belonged to him—no other evidence connects him to the murder of decedent; the jeans were found in a residence Marshall had not actually lived in for more than three weeks before the murder of decedent; the prosecution failed to prove Marshall wore the jeans on the day of the murder; and the jeans actually prove Marshall to be innocent because they show a cut to his right knee; and witnesses William Mayberry and Shelia Jones testified they saw Marshall immediately after noon on the day of the murder and he was wearing short pants and they never saw any cuts, blood or bandages.  Also, the jeans were found June 16, 2006, one day after his arrest for the J & J robbery, and investigators never asked to see if Marshall had been recently cut. [*Id.* at 12-13, Items 23-24, 26-32].

- No weapon or hammer was ever identified or connected to Marshall. [*Id.* at 12, Item 25].

- The OCCA "admit[ted]" the violation of the Confrontation Clause so the conviction should have been reversed; Valerie Fuller should have been required to testify in person so she could have been questioned concerning Marshall's transference/cross-contamination defense. [*Id.* at 14, Items 33-36].

- The appellate review by the OCCA "concerning factual backgrounds of cases of Afro-Americans with high profile media cases are biased and discriminatory and . . . usually occur when either Judge C. Johnson and Lumpkin review the cases" and "[t]he facts are usually completely distorted to cover-up [*sic*] other facts that

---

[5] Marshall was convicted of the store robbery after a jury trial in Tulsa County District Court, Case No. CF-2006-2740, of Robbery With a Dangerous Weapon, After Former Conviction of Two or More Felonies, and sentenced to life imprisonment on August 3, 2007.  His conviction was affirmed by the OCCA in an unpublished summary opinion filed November 18, 2008, in Case No. F-2007-815.  He filed a federal petition for writ of habeas corpus in the United States District Court for the Northern District of Oklahoma, Case No. 08-CV-748-CVE-TLW.  On March 20, 2012, the federal district court denied the writ of habeas corpus and denied his motion for a certificate of appealability.  [*Id.*, Dkt. #25].  On June 28, 2012, the Tenth Circuit Court of Appeals denied his request for a certificate of appealability and dismissed the matter.  [*Id.*, Dkt. #40].  This court previously denied Marshall's Motion to Consolidate this proceeding with Case No. 08-CV-748-CVE-TLW.  [Dkt. #12].

[6] This issue was raised by Marshall in his appeal of his conviction for Robbery With a Dangerous Weapon in connection with the J & J robbery, and in his federal habeas corpus petition concerning that conviction.  Federal District Judge Claire V. Eagan found the OCCA's adjudication of Marshall's claim of misidentification  was not "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  [Case No. 08-CV-748-CVE-TLW, Dkt. #25 at 7].  The Tenth Circuit denied Marshall's request for a certificate of appealability.  No. 12-5054.  Thus, Judge Eagan's order is the final determination of the issue.

represent actual innocence and to intentionally give support to the Attorney Generals [*sic*] Brief Arguments."  [*Id.* at 15, Item 37].

- Contrary to the OCCA's statement that police were unable to locate any of the people named by Marshall as people he saw in the area of Mr. Tibbs' home the morning of the murder, a police report by Corporal C.L. Stout stated "that Detective Vic Regalado did make contact with Veronica Lynn Pack, the alleged prostitute."  Marshall alleges Detective Regalado withheld that report.  [*Id.* at 15, Item 38.  Additionally, Marshall's defense attorney and an investigator for the Office of the Tulsa County Public Defenders interviewed another witness, Terry Moses, who declined to involve himself "for fear he would be wrongfully accused."  [*Id.* at 15, Item 39].

- Witness Glen Humphreys testified decedent was alive during the time Marshall was in the area, which was before 11:30 a.m. the day of the murder.  [*Id.* at 15-16, Items 40, 41 and 43]. His testimony raises questions as to what time Mr. Tibbs was killed and whether Marshall would have had time to accomplish the murder and be in the presence of William Mayberry by 12:30 p.m. and with Shelia Jones at 1:00 p.m. [*Id.*, Item 43].

- The OCCA's determination that the clothing Marshall wore on the morning of June 14, 2006 was found in the trash can at the house on 51st Place North is contrary to the testimony of Humphrey, Jacobs, Mayberry, Detective Felton, Jones and "Item No. 31 itself."  [*Id.* at 16, Item 42].

- If, as prosecutors theorized, Marshall left the Tibbs residence with blood covering his body, then changed clothes at the house on 51st Place North, then blood would have been found in his vehicle; but no blood was found in the vehicle.  [Dkt. #1-1 at 1, Items 46-47].

- Shelia Jones falsely testified that the house on 51st Place North had no running water on June 14, 2006.  [*Id.* at 1, Item 48].

- Jones also falsely testified that when Marshall left the house that morning he was wearing a white t-shirt, long blue jeans and tennis shoes, but when he returned to the residence on North Frankfort to take her to work between 1:00 and 1:30 p.m., he was wearing a striped shirt, short blue jeans and tennis shoes, and he told her he got the short jean pants from his brother.  Marshall told police during the investigation that he left the house that morning wearing a striped shirt, short blue jeans and tennis shoes.  A white T-shirt was never found at the residence at 1524 East 51st Place North. [*Id.* at 2-3, Items 51-54].

- None of the clothes confiscated from the house on North Frankfort, which both Marshall and Jones testified he was wearing when he returned home to take her to work on the afternoon of June 14, 2006, had Mr. Tibbs' DNA on them. [*Id.* at 3, Item 55].

- Jones testified she did not see any cuts, blood or bandages on Marshall when he returned to the residence on North Frankfort the afternoon of June 14, 2006, and Item No. 31 showed a cut and bleeding to the right leg that would have been noticeable to Jones, since Marshall was wearing short jeans.  [*Id.* at 4, Items 59-60].

- On the day of the murder, Marshall drove Shelia Jones to work at 3 p.m. and picked her up from work at 11 p.m.  The two went home and went to bed together. Jones did not notice cuts, blood or bandages on Marshall and no blood was found on any bed item; nor was any item containing Mr. Tibbs' blood found. [*Id.* at 4-5, Items 63-64].

- During trial, Shelia Jones testified Marshall had only three pairs of jeans—two blue and one black.  However, police reports show Marshall had multiple pairs of blue jeans.  This shows the unreliability of Jones' testimony.  [*Id.* at 5, Items 65-66].

- Marshall and Jones—contrary to the OCCA's recitation of facts—did *not* need Mr. Tibbs' money or the money from the J & J robbery to pay their bills or rent. [*Id.* at 5-7, Items 67-72].

- Marshall's niece Sashadawn Mayberry testified falsely that Marshall was at the Bradford Apartment Complex at 11 a.m. on June 25, 2006, and that he was "acting weird."  Mayberry was a 30-year-old woman who used illegal drugs and who thought the police were there to arrest her for a minor offense and was willing to tell the police anything to keep them from concentrating on her.  [*Id.* at 7-8, Items 73-77].

- The admission into evidence of socks was not "harmless error."  The socks had no probative value other than to prejudice Marshall's defense of transference.  The socks do not prove Marshall's guilt but rather actually establish his innocence. Item No. 31 showed a cut and bleeding downward in the right knee area. The blood actually transferred into the leg of the pants.  If Marshall owned and wore the socks on June 14, 2006, the socks would have had blood on them, like the pants.  [*Id.* at 8, Items 78-80].

- The trial court's failure to grant a continuance of the trial so Marshall could cross-examine "the only witness who provided the only evidence against Marshall" violated Marshall's Sixth Amendment Right of Confrontation.[7]  [*Id.* at 8-9, Item 81].

---

[7] Marshall does not identify the witness. In his direct appeal, Marshall also raised the failure to grant a continuance as grounds for reversal.  The OCCA noted the requested continuance was based in part on the trial judge's reversal of an earlier ruling on the State's offer of other crimes evidence and the decision to admit the evidence.  *Marshall*, 232 P.3d at 478.  From this, the court infers Marshall is contending he needed more time to prepare for cross examination of LaDonna Washington, the J & J Depot clerk.

- The OCCA erred in finding that the Confrontation Clause violation was harmless, because without Dr. Fuller's DNA findings there is no evidence.  [*Id.* at 9, Items 82-83].

The court has reviewed Marshall's challenges to the evidence and finds the OCCA's conclusion that admission of DNA evidence was harmless error in light of the remaining evidence was not unreasonable.   *See* 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402 (2000); *Neill v. Gibson*, 278 F.3d 1044, 1050-51 (10th Cir. 2001).  In light of all the evidence presented at trial, admission of the DNA evidence did not have a substantial and injurious effect in determining the jury's verdict.

Marshall is not entitled to habeas corpus relief on his first ground for relief. 28 U.S.C. § 2254(d).

### Ground II: Admission of "Other Crimes" Evidence

Marshall claims that the trial court improperly allowed evidence of other crimes—specifically, his robbery and assault on the clerk at the J & J Bargain Depot—to be introduced. The OCCA determined the evidence was admissible under Oklahoma law as probative of the identity of Mr. Tibbs' assailant as it tended to prove that it was Marshall who beat Mr. Tibbs to death with a hammer.  *Marshall*, 232 P.3d at 477.

The OCCA observed that the State filed a timely notice, as required by *Burks v. State*, 594 P.2d 771, 772 (Okla. Crim. App. 1979), detailing the other crimes evidence involving the J & J robbery.  The court stated:

> Here, the other crimes evidence involved the use of a distinctive weapon in a distinctive manner. In the J & J robbery, Appellant used a hammer to strike the clerk on the back of the head in order to incapacitate her.  An investigating officer testified that in his 35 years as a police officer, he had never seen a hammer used as a weapon in a robbery.  Mr. Tibbs was killed by multiple blows to the head with a blunt instrument.  While the medical examiner could not definitely say the murder weapon was a hammer, the injuries were consistent with blows from a

21

hammer. Mr. Tibbs wallet was not found in his pants pocket where it was usually kept but in a trash can in a house where Appellant previously lived.  The J & J robbery was committed on May 30, 2006, less than five miles from where Mr. Tibbs lived and was murdered on June 14, 2006.  Ms. Washington, the J & J store clerk, identified Appellant from a photographic line-up and at the trial in that case.    The admission of this evidence is consistent with the analysis and admission of like evidence this Court set out in *Pickens v. State*, 1988 OK CR 35, ¶3, 751 P.2d 742, 743, and *Williams v. State*, 2008 OK CR 19, ¶¶36-39, 188 P.2d 208, 218-219.

232 P.3d at 477.  Further, the court noted that the trial judge properly instructed the jury that the other crime was not to be considered as proof of guilt or innocence of the charged offense.  *Id.*

Admissibility of evidence is a matter of state law, and as a general matter, federal habeas corpus relief does not lie to review state law questions about the admissibility of evidence.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  The Tenth Circuit has held the law does not allow issuance of the writ of habeas corpus on the basis of a perceived error of state law "absent a determination that the state law violation rendered the trial fundamentally unfair."  *Spears v. Mullin*, 343 F.3d 1215, 1245 (10th Cir. 2003) (quoting *James v. Gibson*, 211 F.3d 543, 555 (10th Cir. 2000)).  Thus, the habeas court "will not disturb a state court's admission of evidence of prior crimes, wrongs or acts unless the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that the admission denies defendant due process of law."  *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002) (citation omitted).

After reviewing the trial transcripts, the court finds that the OCCA's rejection of Marshall's claim on direct appeal is neither contrary to, nor an unreasonable application of, these general principles.  Marshall has failed to demonstrate that the probative value of the evidence of the J & J robbery and assault was "so greatly outweighed by the prejudice flowing from its admission that the admission denie[d] defendant due process of law."  *Id.*  Therefore, the court rejects his claim that admission of the other crimes evidence was improper.

## Grounds III-VI:  Ineffective Assistance of Counsel

In his third through sixth grounds for relief, Marshall complains that trial counsel provided ineffective assistance in failing to cross examine detective Jeff Felton concerning whether statements he asserted in the search warrant affidavit were accurate and provided to him by Shelia Jones; failing to object to the use of known false evidence; failing to move to suppress items seized from the residence located at 1524 East 51st Place North; and failing to move to suppress all evidence obtained from the use of buccal swab DNA evidence.  The OCCA cited *Strickland v. Washington*, 466 U.S. 668 (1984), and denied relief on Marshall's ineffective assistance of counsel claims.

## Applicable Legal Standard

To be entitled to habeas corpus relief on his claims of ineffective assistance of counsel, Marshall must demonstrate that the OCCA's adjudication of this claim was an unreasonable application of  *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a defendant must show that his counsel's performance was deficient and that the deficient performance was prejudicial.  *Id.* at 687; *Osborn v. Shillinger*, 997 F.2d 1324, 1328 (10th Cir. 1993).

A defendant can establish the first prong by showing that counsel performed below the level expected from a reasonably competent attorney in criminal cases.  *Strickland*, 466 U.S. at 687-88.  There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  In making this determination, a court must "judge . . . [a] counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Id.* at 690.  Moreover, review of counsel's performance must be highly deferential.  "[I]t is all too easy for a court, examining counsel's defense after it has

23

proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689.

To establish the second prong, a defendant must show this deficient performance prejudiced the defense to the extent that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694; *see also Sallahdin v. Gibson*, 275 F.3d 1211, 1235 (10th Cir. 2002); *Boyd v. Ward*, 179 F.3d 904, 914 (10th Cir. 1999).  This court's review of the OCCA's decision on ineffective assistance of counsel claims is "doubly deferential."  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1403 (2011) (noting that a habeas court must take a "highly deferential" look at counsel's performance under *Strickland* and through the "deferential lens of § 2254(d)").

### Ground III: Failure to Cross-Examine Detective Felton

Marshall argued on direct appeal that counsel was ineffective for failing to cross-examine Detective Felton concerning statements used in the affidavit for the search warrant of Marshall's car.  He asserted the affidavit contained inaccurate statements.  The OCCA concluded Marshall had failed to show how he was prejudiced by counsel's conduct because (1) he failed to identify what the inaccuracies in the affidavit might be or how they would have been corrected on cross-examination; and (2) he did not state how he was prejudiced by the search of his car. *Marshall*, 232 P.3d at 481.  In so ruling, the court observed, "The evidence linking him to the murder—the bloody jeans, socks and the decedent's wallet—were found in the house on 51st, and not the car." *Id.*

In his habeas petition, Marshall elaborates on his claim.  He contends that if Shelia Jones told Detective Felton that "the pants Marshall wore on 6-14-06 the day of Mr. Tibbs death were

crumpled up in the backseat of his Toyota," as stated in Felton's sworn search warrant affidavit, then Marshall certainly did not wear the pants item No. 31 found in the residence at 1524 E. 51 Pl. N. and Marshall's defense of transference [was] viable as stated by D.N.A. expert Byron Smith who did testify at the jury trial." [Dkt. #1-2 at 4]. He concludes:

> The police detectives in this case matter did seize pants from the backseat of the Toyota Camry, two (2) pair of blue jeans that did not have Mr. Tibbs D.N.A. on them. Marshall was prejudiced because he was deprived of exculpatory and impeachment evidence that could have proven his actual innocence and proven his defense of transference.

[*Id.* at 5].

Even assuming cross-examination of Detective Felton could have revealed the inconsistency between his account of what Shelia Jones told him and Shelia Jones' own testimony that Marshall left the house wearing the blue jeans later found at the house on 51st Place North, Marshall cannot show prejudice. The inconsistency was exposed during cross-examination of Shelia Jones when, in response to defense counsel's question, she denied telling police the clothes Marshall had been wearing on June 14 were in the back seat of his Toyota Camry. [Dkt. #15-11, Tr. Trans. at 1014].

Marshall has failed to demonstrate that the OCCA's adjudication of this claim was an unreasonable application of *Strickland*. He is not entitled to habeas corpus relief under 28 U.S.C. § 2254(d).

### Ground IV:  Failure to Object to False Testimony

### Jacobs Testimony

On direct appeal, Marshall contended his trial counsel was ineffective because she failed to object to false testimony by Tibbs' neighbor, Nathaniel Jacobs, that before 12:20 p.m. on the day of the murder, he heard his dog barking. This testimony, Marshall argued, formed the basis

for the prosecution's assertion that he cut his leg on the fence leaving the scene of the crime. *Marshall*, 232 P.3d at 481. Further, he claimed the State failed to provide any pre-trial discovery concerning Jacobs's testimony and defense failed to raise an objection.

The OCCA rejected Marshall's claim of ineffective assistance, noting that Marshall had provided no information showing Jacobs's testimony was false or that there was any discovery violation, and Jacobs was thoroughly cross-examined at trial without any mention of any discovery violation. *Id.* at 481-82.

In his direct appeal, Marshall also asserted the prosecutor had Shelia Jones testify falsely that the water was turned off at 1524 East 51st Place North, the residence, and defense counsel failed to object. *Id.* at 232 P.3d at 482. The OCCA rejected his claim of ineffective counsel, finding he offered no support for his claim that Jones' testimony was false and had failed to show any prejudice by counsel's conduct. *Id.*

In his habeas petition, Marshall abandons his argument that Jacobs testified falsely, stating, "[Marshall] is not asserting Mr. Jacobs actually lied during his jury trial testimony. [Marshall] is showing how the prosecutors used  Mr. Jacob's surprise testimony to set-up their false theories through the false statements of Shelia Jones in reference to the water allegedly being not on at the residence located at 1524 E. 51 Pl. N."  [Dkt. #1-2 at 7].

The connection between Mr. Jacobs' testimony about the fence on the Tibbs property and Jones' testimony that water was not on in the residence located at 1524 East 51 Place North is tenuous at best.  Therefore, the court finds that Marshall has failed to demonstrate that the OCCA's adjudication of this claim was an unreasonable application of *Strickland.* He is not entitled to habeas corpus relief.  28 U.S.C. § 2254(d).

**Jones Testimony**

In his habeas petition, Marshall renews his argument that Jones testified falsely that the water had been turned off at the house on 51st Place North "so that the prosecutor could intentionally falsely assert how blood got on other clothing items '<u>not belonging</u>' to Marshall found in the trash." [*Id.*].  Marshall asserts that his attorney should have contacted the water company or the owners of the house, because "no water lease or bill for water payment was registered in the name of Shelia Jones for the residence located at 1524 E. 51 Pl. N in Tulsa" and "trial counsel could have impeached the false testimony of Shelia Jones before the jury." [Dkt. #1-2 at 8].  He also states:

> Trial counsel knew the testimony of Shelia Jones was false and staged from reviewing the investigative reports and talking personally to [Marshall].  The prosecutor Th[o]rp was complaining to trial counsel about how well she had countered his evidence up to the point of the last three (3) witnesses: Shelia Jones, William Mayberry and Sashadawn Mayberry.  The prosecutor had the Judge to call a recess period went out with trial counsel to the Judge's office came back in and trial counsel refused to adequately cross-examine any witness from that point.  During closing arguments trial counsel refused to remove the pants item No. 31 from the brown bag and point out to the Jury the cut to the pants leg and bleeding in that area.

[*Id.* at 8-9].

Defense counsel cross-examined Jones regarding the utilities at the house on 51st Street North.  Jones testified the gas had been shut off before she moved from the house; she had the electricity transferred to the new house in her name; and her son had the water transferred to the new house in his name.  [Dkt. #15-11, Tr. Trans. at 1009].  Marshall has presented nothing but conjecture and speculation that Jones' testimony was false.

Therefore, the court finds that Marshall has failed to demonstrate that the OCCA's adjudication of this claim was an unreasonable application of *Strickland.* He is not entitled to habeas corpus relief.  28 U.S.C. § 2254(d).

27

**Ground V:  Failure to File Motion to Suppress**

On direct appeal, Marshall claimed trial counsel was ineffective because she failed during trial to object to admission of evidence from the house on 51st Place North.  In rejecting this claim, the OCCA pointed out that before trial, Marshall's attorney filed a motion to suppress the evidence seized from the house, but the trial court overruled the motion, and counsel did not again object to the evidence when it was admitted.  *Marshall*, 232 P.3d at 482.  The appellate court found that Marshall lacked standing to object to the search warrant for the house on 51st Place North because Marshall was no longer a tenant there, and that, even if Marshall *had* established standing, the affidavit in support of the search warrant was more than sufficient to support the search.  *Marshall*, 232 P.3d at 478-79.  As a result, the court concluded, "[W]e will not find counsel ineffective for failing to raise a second objection to the admission of the seized evidence."  *Id.*

In his habeas petition, Marshall renews his argument that counsel was ineffective because she did not object to admission of the evidence during trial.  However, the viability of both the original motion to suppress and any objection to admission of the evidence during trial depended on whether the search warrant was lawful.  The OCCA's determination that the warrant was lawful is not subject to review on habeas corpus.  *See Stone v. Powell*, 428 U.S. 465, 481-82 (1976) ("[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.")

Because the trial court denied the motion to suppress evidence obtained from the house on 51st Place, and the OCCA found the search of the house was lawful, Marshall cannot show

that trial counsel's failure to object to admission of the evidence during trial was prejudicial.  *See*

*Strickland*, 466 U.S. at 687; *Osborn v. Shillinger*, 997 F.2d 1324, 1328 (10th Cir. 1993).

Therefore, the court finds that Marshall has failed to demonstrate that the OCCA's

adjudication of this claim was an unreasonable application of *Strickland v. Washington*, 466 U.S.

668 (1984).  He is not entitled to habeas corpus relief.  28 U.S.C. § 2254(d).

### Ground VI: Failure to Move to Suppress DNA Results of Buccal Swabs

On direct appeal, Marshall asserted trial counsel was ineffective for failing to object to

the DNA taken from him by buccal swab because he was not advised of his *Miranda* rights.[8]

The OCCA rejected the argument, finding that since the buccal swab was obtained as the result

of a valid search warrant, Marshall was not entitled to advisement of *Miranda* rights prior to

execution of the search warrant. *Marshall*, 232 P.3d at 482.  The appellate court also rejected

Marshall's argument that the supporting affidavit for the warrant contained falsehoods, stating

that Marshall "provides only conclusory allegations in support." *Id.*  The court stated, "A review

of the affidavit shows it was sufficient to support the search warrant for Appellant's DNA.

Appellant has not shown he was prejudiced by counsel's failure to object." *Id.*

In his habeas petition, Marshall again argues the search warrant was improperly issued

because Detective Felton's affidavit in support of it contained numerous falsehoods, including

statements that:

- Marshall had robbed J & J Bargain Depot, Grandpa's Furniture Store and Elvie Tolliver;

- Jennifer Jones had described a black male suspect who was similar in age, height, weight, hair color and style to Marshall;

---

[8] On December 13, 2006, Marshall filed a *pro se* Motion to Quash/Motion to Dismiss in which he argued the buccal swabs were unlawfully obtained and asserted the Little affidavit contained false statements.  [Dkt. #15-15 at 3, 63-68, Dkt. #15-16 at 1-19].  On February 28, 2007, the motion was stricken as withdrawn by the defendant.  [Dkt. #15-15 at 9].

- That the investigation revealed Henry Cobb resides at 4666 North Hartford Avenue;

- That robbery detectives learned Marshall and Cobb were close associates;

- That Shelia Jones resides at 4670 North Hartford Avenue; and

- That this residence is located next to Henry Cobb and across the street from the victim, Mr. Tibbs.

[Dkt. #1-3 at 6-7].

The court has reviewed the affidavit in support of the search warrant for buccal swab.

[Dkt, #15-20 at 3-6]. The court concurs with the OCCA's conclusion that the affidavit was

sufficient to warrant the issuance of the warrant. Specifically, the affidavit alleged that through

investigation, detectives had established that each of the three previous robberies were

committed in a similar manner and method of operation; that a black male suspect of similar

physical description was involved in each incident; that detectives received information

identifying Marshall as the person perpetrating each assault and robbery; that through

photographic line-up, Marshall was positively identified as the person who committed the

robbery and assault at the J & J Bargain Depot; and that a warrant had been issued for his arrest

in connection with the case. Additionally, the affidavit alleged that investigation of the Tibbs

homicide revealed he had suffered severe head trauma and the medical examination revealed he

had died as a result of blunt force trauma to the head and the injuries appeared to be caused by an

instrument consistent with a hammer. The affidavit also alleged that Shelia Jones "resides" at

4670 North Hartford. Although Shelia Jones no longer resided at that address when the affidavit

was signed on June 15, 2006, she *had* resided at the address from August 2005 until January

2006.

Because the OCCA found the warrant for the buccal swab was lawful, Marshall cannot show that trial counsel's failure to file a motion to suppress during trial was prejudicial. *Strickland*, 466 U.S. at 687; *Osborn v. Shillinger*, 997 F.2d 1324, 1328 (10th Cir. 1993).

Therefore, the court finds that Marshall has failed to demonstrate that the OCCA's adjudication of this claim was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). He is not entitled to habeas corpus relief. 28 U.S.C. § 2254(d).

### IV. Certificate of Appealability

Rule 11, *Rules Governing Section 2254 Cases in the United States District Courts*, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Pursuant to 28 U.S.C. § 2253, the court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicate[s] which specific issue or issues satisfy [that] showing." A petitioner can satisfy that standard by demonstrating that the issues raised are debatable among jurists, that a court could resolve the issues differently, or that the questions deserve further proceedings. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)).

In this case, the court finds that a certificate of appealability should not issue. Nothing suggests that the Tenth Circuit would find that this Court's application of deference to the decision by the OCCA was debatable among jurists of reason. *Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004). The record is devoid of any authority suggesting that the Tenth Circuit Court of Appeals would resolve the issues in this case differently. A certificate of appealability shall be denied.

**V. Conclusion**

After careful review of the record in this case, the court concludes Marshall has not established that he is in custody in violation of the Constitution or laws of the United States. Accordingly, his petition for writ of habeas corpus shall be denied.

Therefore, it is hereby ordered that:

1.   The petition for writ of habeas corpus [Dkt. #1] is denied.

2.   A certificate of appealability is denied.

ENTERED this 16th day of August, 2013.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT